FILED & JUDGMENT ENTERED
Steven T. Salata

July 7 2021

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

_Laura T Beyer_
Laura T. Beyer
United States Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **VR KING CONSTRUCTION, LLC,** | ) | Chapter 7 |
| | ) | Case No. 18–31635 |
| Debtor. | ) | |
| ――――――――――――――― | ) | |
| | ) | |
| In re: | ) | |
| | ) | |
| **VINROY W. REID,** | ) | Chapter 7 |
| | ) | Case No. 18–31436 |
| Debtor. | ) | |
| ――――――――――――――― | ) | |

## ORDER OVERRULING OBJECTIONS TO CLAIM

**THIS MATTER** is before the court on VR King Construction, LLC's ("VR King"), Vinroy Reid's ("Reid"), and the Chapter 7 Trustee's objections to the claim (the "Claim") filed by Y2 Yoga Cotswold, LLC ("Y2 Yoga"). In the Claim, Y2 Yoga asserts that the Debtors, VR King and Reid, are indebted to Y2 Yoga in the amount of $1,218,901.99 secured by real estate with a value of $2,000,000. For the reasons explained below, the court overrules the objections to the Claim.

## I.   Facts and Procedural History

The court has previously explained the facts and procedural history relevant to this bankruptcy proceeding.  See Y2 Yoga Cotswold, LLC v. V.R. King Construction, LLC (In re VR King Construction, LLC), Ch. 7 Case No. 18-31635, Adv. No. 19-3047, 2020 WL 7063192, at *1-6 (Bankr. W.D.N.C. Dec. 2, 2020).[1]  On December 2, 2020, the court entered identical orders in the VR King and Reid adversary proceedings that resolved many of the common issues in those proceedings.  The orders granted Y2 Yoga, the plaintiff in each adversary proceeding, summary judgment as to its first and second claims for relief, thereby establishing that Y2 Yoga has a properly perfected security interest in the attached properties that secure Y2 Yoga's judgment and that its security interest has priority over any rights that the Trustee or Debtors have in the property.  See id. at *17.  The court also denied the Trustee's motions to dismiss, granted Y2 Yoga summary judgment with respect to the defenses of res judicata, collateral estoppel, the Rooker-Feldman doctrine, and the affirmative defenses asserted by VR King and Reid, and denied the Rule 12 motions of VR King and Reid.  See id.  The court further concluded that the Y2 Yoga Expansion Construction Agreement (the "Construction Agreement") between the parties is an enforceable agreement under North

---

[1] An adversary proceeding was simultaneously filed in Reid's Chapter 7 proceeding and is pending before this court as adversary proceeding no. 19-3049. The parties, the facts pled, the relief sought in each complaint, and the defenses thereto in each of the two adversary proceedings are identical.

Carolina law, the indemnity provision in the Construction Agreement is valid and enforceable as a reciprocal attorney's fees provision under North Carolina General Statute § 6-21.6, and the indemnity claim may be adjudicated in further proceedings before this court.  See id.

The court deferred ruling on the issues raised pursuant to 11 U.S.C. § 506(b) in Y2 Yoga's third claim for relief given that it was unclear at the time whether the Debtors' estates were fully solvent.[2]  See id. at *16.  The court explained that, if necessary, it could make a determination regarding the § 506(b) claim after the Trustee sells the Debtors' real property.  Id.  The Trustee raised the legal issue as to whether Y2 Yoga is entitled to reasonable attorney's fees under § 506(b) as the holder of a nonconsensual lien.  Id.  Under the Fourth Circuit's recent decision in SummitBridge, a creditor can assert a separate unsecured claim for post-petition attorney's fees.  See SummitBridge Nat'l Invs. III, LLC v. Faison, 915 F.3d 288, 292—97 (4th Cir. 2019) (concluding that § 506(b) does not disallow unsecured claims for post-petition attorney's fees).  As a result, even if Y2 Yoga does not have a secured claim for reasonable attorney's fees pursuant to § 506(b), it would still have an unsecured claim.  Y2 Yoga, 2020 WL 7063192, at *16.

---

[2] It appears that the estates are fully solvent and will be able to pay all claims in full, whether they are secured or unsecured.

With this background in mind, the court instructed Y2 Yoga to file an amended proof of claim by July 6, 2020, and for the other parties to file any objections by July 20, 2020, in anticipation of holding a hearing soon after. Y2 Yoga subsequently amended its proof of claim on July 6, 2020, asserting that the Debtors were indebted to it in the amount of $981,139.49 and that real estate with a value of $2,000,000 secures the claim. The amounts due were broken down as follows: a) principal amount of February 8, 2019 state court final judgment ("Final Judgment"): $396,649.57; b) costs of state court litigation: $23,131.98; c) interest on Final Judgment through October 1, 2020 at the rate of 8%: $207,429.30; d) pre-petition legal fees of Horack Talley Pharr & Lowndes, P.A. ("HT"): $52,683.73; e) pre-petition fixed legal fee of David G. Guidry ("Guidry"): $19,000; f) Guidry's post-petition contingency fee: $282,244.91; and g) post-petition legal fees of bankruptcy counsel, The Henderson Law Firm, PLLC: "To be determined." Y2 Yoga amended its proof of claim again on July 16, 2020 to assert a debt in the amount of $1,218,901.99 secured by real estate with a value of $2,000,000. Attached to the July 16 amended claim is an invoice from The Henderson Law Firm ("Henderson") which states that, as of July 10, 2020, Y2 Yoga owes Henderson $222,615.00. There is also a separate invoice in the amended claim for a previous balance totaling $15,147.50. The fees and expenses are related to Henderson's ongoing

representation of Y2 Yoga in the bankruptcy proceedings. The Debtors and the Chapter 7 Trustee each filed written objections to the Claim on July 20, 2020.

The court rescheduled the hearing on the objections to the Claim for a variety of reasons and ultimately held the hearing on February 2 and February 3, 2021. The Chapter 7 Trustee and attorneys for the Debtors and Y2 Yoga appeared at the hearing. The court announced its ruling on February 16, 2021. The objections are addressed in turn below.

## II.  Objections of VR King and Reid

VR King and Reid object to the Claim in its entirety since it was amended 10 days after the court's July 6, 2020, deadline. VR King previously raised the same objection in its July 24, 2020, Motion to Strike the Claim, and the court denied that motion on February 2, 2021.[3] For the same reasons, the court overrules this objection. The Debtors also object to the Claim for reasons related to § 506(b), but, as previously explained, the court preserved ruling on those issues and, for purposes of this hearing, will assume that the Debtors' estates are solvent and that all claims will be paid in full.

Next, the Debtors assert that Y2 Yoga may not recover attorney's fees in excess of the judgment amount of $396,649.57. Under § 6-21.6(f), the award of reasonable attorney's fees may not

---

[3] The court subsequently entered its Order Denying Motion to Strike on March 16, 2021.

exceed the amount in controversy, and the Debtors argue that the amount in controversy equates to the damages awarded by the jury in state court.  This argument is a misreading of the statute based on the plain meaning and legislative history of the statute.

First, the plain language of § 6-21.6 indicates that the amount in controversy does not equate to the judgment obtained. Specifically, § 6-21.6(c)(1) references both the "amount in controversy" and the "results obtained" as factors courts should consider in determining reasonable attorney's fees and expenses under § 6-21.6.  The "results obtained" refers to the damages awarded by the jury, and thus, the "amount in controversy" must necessarily have some other meaning.  This is consistent with the common understanding that the use of the phrase "amount in controversy" in other statutes does not refer to the judgment obtained at trial.  For example, for purposes of determining the jurisdictional limits of certain courts, the amount in controversy refers to the damages sought in the complaint at the inception of an action rather than the damages awarded by a jury at the conclusion of the lawsuit.

Second, the amount in controversy is not synonymous with the judgment amount based on a review of the legislative history.  As originally enacted, the last sentence of § 6-21.6(b) provided that "[i]n any suit, action, proceeding, or arbitration primarily for the recovery of monetary damages, the award of reasonable

attorneys' fees *may not exceed the monetary damages awarded.*"
(emphasis added). In 2015, as part of a technical corrections
bill, the legislature amended § 6-21.6(b) to remove the last
sentence concerning the monetary damages award cap. <u>See</u> S.L. 119,
2015 Gen. Assemb., Reg. Sess. (N.C. 2015) (providing for technical
corrections to general statutes and sessions laws). Courts in
North Carolina must give every word of a statute effect and presume
"that the legislature carefully chose each word used." <u>N.C. Dep't</u>
<u>of Corr. v. N.C. Med. Bd.</u>, 363 N.C. 189, 201, 675 S.E.2d 641, 649
(2009) (citing <u>Rhyme v. K-Mart Corp</u>., 358 N.C. 160, 188, 594 S.E.2d
1, 20 (2004)). Here, the deletion of the "monetary damages"
language in the statute clearly indicates a choice by the
legislature that a claim for legal fees and expenses is not
necessarily limited to the judgment amount.

In this case, the amount sought in the Statement of Monetary
Relief Sought filed in the state court action was between $1.7 and
$2.5 million. This figure did not include treble damages and
punitive damages sought in state court or the interest, costs, and
attorney's fees sought in the current proceeding. Guidry, the
attorney for Y2 Yoga for most of the state court proceeding,
testified that Y2 Yoga sought damages of $2.4 million consisting
of $1.7 million in repairs and completion of the construction
project and $700,000 in lost profits. Therefore, the amount in
controversy in this case was at least $1.7 million and does not

equate to the judgment of $396,649.57 that the state court awarded to Y2 Yoga.

Lastly, the Debtors argue that the attorney's fees of HT and Guidry are pre-petition fees that are not allowed pursuant to the ruling in <u>SummitBridge</u>.  This is a misstatement of the issue and the holding in that case.  <u>SummitBridge</u> holds that a creditor may assert an unsecured claim for post-petition attorney's fees based on a pre-petition contract and does not address pre-petition attorney's fees.  915 F.3d at 291—97.  The ruling in <u>SummitBridge</u> is not applicable to the pre-petition fees of HT or Guidry that this court has already allowed pursuant to the pre-petition Construction Agreement.  In conclusion, none of the objections raised by the Debtors have any merit.

### III. Objections of the Trustee

The Trustee objects to the Claim on three bases.  The first is that the court cannot determine that Y2 Yoga's claim is over-secured and thus, cannot determine what, if any, costs and post-petition interest are allowable under § 506(b).  It is unclear what "costs" the Trustee is referring to.  The only costs Y2 Yoga seeks are the $23,131.98 in state court costs pursuant to the Superior Court's February 8, 2019, Order on Post-Verdict Motions (the "Post-Verdict Order").  These costs are an allowed part of Y2 Yoga's secured claim.  With respect to the interest, the Final Judgment awarded interest at the legal rate of 8% from and after

the date of the breach of contract, March 21, 2014.  Therefore, Y2

Yoga's secured claim would include interest on its judgment running

from March 21, 2014, until the petition date of these bankruptcy

proceedings, September 21, 2018, for Reid and October 31, 2018,

for VR King.  Pursuant to § 506(b), Y2 Yoga is not entitled to any

post-petition interest unless the claim is oversecured.  As already

noted, it cannot be determined yet whether Y2 Yoga's claim is

oversecured.[4]

Second, the Trustee objects to the Claim on the basis that

the attorney's fees are unreasonable.  The Trustee does so without

addressing any of the specific factors in § 6-21.6 or any of the

Johnson factors used to assess reasonableness under § 506(b).[5]

Third, the Trustee objects to the Claim on the ground that the

attorney's fees exceed the amount in controversy.  This argument

was previously addressed, and the Trustee abandoned this argument

at the hearing on the objection.  In summation, similar to the

objections raised by the Debtors, the objections of the Trustee

are not persuasive.  Having disposed of the objections raised by

the Debtors and the Trustee, the final issue to resolve in

determining the validity of the Claim is to analyze the

reasonableness of HT's, Guidry's, and Henderson's fees.

---

[4] Again, the Debtors estates appear to be fully solvent, and Y2 Yoga is likely
oversecured and entitled to its post-petition interest.
[5] The reasonableness of the attorney's fees is addressed in more detail in the
next section of this order.

## IV.   Reasonableness of Attorney's Fees

As already noted, the Construction Agreement is an enforceable agreement and the indemnity provision in the Construction Agreement is valid and enforceable as a reciprocal attorney's fees provision under § 6-21.6.  Therefore, the court must determine the reasonableness of the fees sought by HT, Guidry, and Henderson in the Claim.  None of the objections to the Claim address the factors courts use to analyze the reasonableness of fees with the exception of those related to the amount in controversy.  However, it is the burden of the creditor to prove the reasonableness of the requested fees.  See In re McCormick, 417 B.R. 372, 376 (Bankr. M.D.N.C. 2008) (citations omitted).  As a result, Y2 Yoga must demonstrate that the attorney's fees requested are reasonable under the proper standard.

Courts use different standards to determine reasonableness in different circumstances.  Under § 506(b), any reasonable attorney's fees are allowed to the extent that a secured claim is oversecured.  In determining reasonableness under § 506(b), courts look to the twelve Johnson factors, which are as follows:

> (1) the time and labor required in the case, (2) the novelty and difficulty of the questions presented, (3) the skill required to perform the necessary legal services, (4) the preclusion of other employment by the lawyer due to acceptance of the case, (5) the customary fee for similar work, (6) the contingency of a fee, (7) the time pressures imposed in the case, (8) the award involved and the results obtained, (9) the experience, reputation, and ability of the lawyer, (10) the "undesirability" of the case, (11) the nature and length

of the professional relationship between the lawyer and
the client, and (12) the fee awards made in similar
cases.

E.g., Pellegrin v. Nat'l Union Fire Ins. Co. of Pittsburgh (In re
Abrams & Abrams, P.A.), 605 F.3d 238, 244 (4th Cir. 2010); see
Johnson v. Ga. Highway Express, Inc., 488 F.2d 714, 717—19 (5th
Cir. 1974), abrogated by Blanchard v. Bergeron, 489 U.S. 87
(1989).[6] An award of attorney's fees under § 6-21.6 must also be
reasonable, and, specifically, a court may consider the following
factors when determining reasonableness:

> (1) The amount in controversy and the results obtained,
> (2) The reasonableness of the time and labor expended,
> and the billing rates charged, by the attorneys, (3) The
> novelty and difficulty of the questions raised in the
> action, (4) The skill required to perform properly the
> legal services rendered, (5) The relative economic
> circumstances of the parties, (6) Settlement offers made
> prior to the institution of the action, (7) Offers of
> judgment pursuant to Rule 68 of the North Carolina Rules
> of Civil Procedure and whether judgment finally obtained
> was more favorable than such offers, (8) Whether a party
> unjustly exercised superior economic bargaining power in
> the conduct of the action, (9) The timing of settlement
> offers, (10) The amounts of settlement offers as
> compared to the verdict, (11) The extent to which the
> party seeking attorneys' fees prevailed in the action,
> (12) The amount of attorneys' fees awarded in similar
> cases, and (13) The terms of the business contract.

N.C. GEN. STAT. § 6-21.6(c).

In Abrams, after observing that the parties spent a great
deal of time litigating whether the review of attorney's fees was

---

[6] The Supreme Court did not abrogate the Johnson factors, and other courts often
cite to them when analyzing the reasonableness of attorney's fees
under § 506(b). Blanchard abrogated Johnson by holding that a contingency fee
arrangement did not place a cap upon fees recoverable by a prevailing plaintiff.

a federal or state question, the Fourth Circuit was "not convinced
. . . that the law of either state is so different from the federal
standard as to make a difference" and was "persuaded that the
virtues of simplicity and straightforwardness counsel against
adopting different standards with different shades and nuances in
different contexts." Pellegrin v. Nat'l Union Fire Ins. Co. of
Pittsburgh (In re Abrams & Abrams, P.A.), 605 F.3d 238, 244 (4th
Cir. 2010) (citation omitted).  In this case, since the two
standards at issue are very similar and the court has deferred
ruling on whether the attorney's fees are secured or unsecured,
the court will follow the lead of the Abrams case and analyze the
reasonableness of all the attorney's fees primarily using the
factors set out in § 6-21.6(c) as it would for any pre-petition or
unsecured attorney's fees while also considering the Johnson
factors used pursuant to § 506(b) as set out in Abrams, which is
a contingency fee case. See id. (noting that in a contingency fee
case, district courts should look to the twelve factors first set
forth in Johnson and adopted by the Fourth Circuit in Barber v.
Kimbrell's, Inc., 577 F.2d 216, 226 (4th Cir. 1978) and Allen v.
United States, 606 F.2d 432, 436 (4th Cir. 1979)).  The court
largely agrees with the chart attached as Exhibit A to the Amended
and Supplemental Declaration of David G. Guidry ("Chart") that
provides a summary comparison of the factors set forth in § 6-21.6

and in Abrams.[7]  To the extent that the court applies specific
factors under § 6-21.6(c), it also applies comparable factors set
out in Abrams consistent with the Chart.[8]  The factors are addressed
in turn below and will largely discuss the fees of Guidry since
they were the focus of the objections and the evidence.  HT's fees
and Henderson's fees are addressed as well but in less detail.

## A. Amount in controversy, the results obtained, and the extent to which the party seeking attorney's fees prevailed in the action.[9]

The court has already addressed the meaning of the "amount
in controversy" and determined that the amount was at least $1.7
million.  The parties spent much of the February 2—3 hearing
discussing the results obtained and the extent to which Guidry
prevailed on behalf of Y2 Yoga.  The state court action in this
case contained multiple causes of action including breach of
contract, fraud, negligent misrepresentation, conversion, punitive
damages, unfair or deceptive trade practices, and fraudulent
transfer.  See Y2 Yoga Cotswold, LLC v. Reid, No. 16-CVS-023179,
2019 WL 5099480, at *1 (N.C. Super. Ct. Feb. 8, 2019).  The jury
found for Y2 Yoga on the breach of contract claim, found against
Y2 Yoga on all other claims, and awarded damages in the amount of
$396,649.57 plus costs and interest at the rate of 8% from the

---

[7] The factors in Abrams are the same as the twelve Johnson factors.  See Abrams, 605 F.3d at 244.

[8] The court specifically addresses any differences between the two standards.

[9] These are factors 1 and 11 of § 6-21.6.  These are analogous to Abrams factors 5 ("customary fee for similar work") and 8 ("award involved and the results obtained").

date of the breach.   See id.; see also Y2 Yoga Cotswold, LLC v. Reid, No. 16-CVS-023179, 2019 WL 5099484, at *1 (N.C. Super. Ct. Mar. 6, 2019) (awarding $23,131.98 in costs).   The Debtors and the Trustee suggested that since Y2 Yoga only prevailed on the breach of contract claim and recovered only about 25% of what it sought in its complaint, Guidry did not prevail on behalf of Y2 Yoga.

This assertion is incorrect given that a $396,649.57 judgment plus costs and interest is an accomplishment in and of itself, particularly in a case of this nature where certain claims alleged are difficult to prove.   Supporting this conclusion is the testimony of Randy Matz ("Matz"), one of Y2 Yoga's investors, who stated that he was pleased with the result.   In addition, it stands to reason that the results obtained relative to the amount in controversy should be given less weight in a contingency fee case since the fee awarded is directly tied to the result obtained. Had Y2 Yoga won a larger verdict, Guidry's fee would have been larger, and this same objection would have been raised on a larger scale.

With respect to Henderson's fees relative to Y2 Yoga's success in this bankruptcy case, Y2 Yoga has prevailed in all respects in this proceeding—beginning with the conversion of the case, the reconsideration of the conversion, the appeal of the conversion, the declaratory judgment proceedings, the reconsideration of the court's ruling on summary judgment, and now the hearing on the

objections to claim.  As for HT's fees, Guidry and Matz both
testified that HT's work leading up to the filing of the first and
second complaint was helpful and contributed to Y2 Yoga's
successful verdict.  In conclusion, HT's, Guidry's, and
Henderson's fees are all reasonable in light of the amount in
controversy, the results obtained, and the extent to which the
parties prevailed.

### B. Novelty and difficulty of the questions raised in the action[10]

This factor weighs in favor of considering Guidry's fee
reasonable.  The state court litigation was somewhat novel due to
the attachment lien issues, the multiple parties involved, the
destruction of the defendant's business records in a fire, the
insurance coverage litigation in federal district court, and the
many causes of action alleged in the complaint.  The overlay of
the bankruptcy issues and the work done by Guidry and Henderson to
assist Y2 Yoga in recovering the judgment it obtained in state
court make these proceedings even more difficult.  Another
indication that the litigation is complex is the fact that the
state court designated the first complaint as a Rule 2.1 case.
Rule 2.1 of North Carolina's General Rules of Practice for the
Superior and District Courts provides that the Chief Justice may

---

[10] This is factor 3 of § 6-21.6(c) and is analogous to Abrams factor 2 ("the novelty and difficulty of the questions presented").  This section also addresses Abrams factors 10 ("the 'undesirability' of the case") and 11 ("the nature and length of the professional relationship between the lawyer and the client").

designate any case as "exceptional" or "complex business," and factors to consider in making this designation include the number of parties, the amount of anticipated pretrial discovery, and the complexity of the legal issues.  According to Guidry's testimony, the state court did not designate the second complaint as a 2.1 case due to the number of parties involved and the inability to coordinate the designation but not because the case did not meet the criteria.  Thus, all of these facts support the conclusion that this is a novel and difficult case.

In addition, the circumstances of Guidry's representation coupled with the risks associated with the case made it undesirable.  Y2 Yoga previously pursued the case against the Debtors with HT representing them on a time and expense basis. After Y2 Yoga paid HT all it could afford, Matz testified it had to change strategies to survive.  It took a dismissal of the case and focused on completing the construction project.  Y2 Yoga was in a desperate state financially due to the construction delays, and, since Guidry had a relationship with the owner of Y2 Yoga, he agreed to represent Y2 Yoga on a contingency fee basis with a flat fee of only $19,000.  This was the only way Y2 Yoga could afford to reopen and recover some of the damages related to the faulty construction. As the court similarly concluded in Abrams, Guidry's representation of Y2 Yoga on a contingency fee basis served as the only way for Y2 Yoga to protect its interest and was "the key to

the courthouse door" for Y2 Yoga.  <u>Abrams</u>, 605 F.3d at 246.  In summary, Guidry took this case with no guarantee of recovering any fees above $19,000, and this made it an undesirable case.  With respect to HT, the same facts that made the case difficult, complex, and undesirable for Guidry made the case novel and undesirable for HT.  This is further evidenced by the fact that HT withdrew from representing Y2 Yoga shortly after filing the second complaint since Y2 Yoga could no longer afford its representation on a time and expense basis.

With regards to Henderson and the difficulty of the work, the bankruptcy cases involve novel issues given the few reported cases interpreting North Carolina's attachment lien statute and the right to reciprocal attorney's fees under § 6-21.6 in the bankruptcy context.  Moreover, the overlay of the state court litigation and the fact that the case remains vigorously disputed to this day contributes to the difficulty of the case.  Likewise, Henderson testified that considering the current financial state of Y2 Yoga, there was substantial risk that Y2 Yoga would not be able to afford his fees, and he primarily took on the case as a favor to his former neighbor—the owner of Y2 Yoga.  Therefore, the same facts that made the case undesirable for Guidry and HT made the case undesirable for Henderson.  In conclusion, Guidry's, Henderson's, and HT's fees are all reasonable considering the novelty, difficulty, and undesirability of the case.

**C. The reasonableness of the time and labor expended, the billing rates charged by the attorneys, the skill required to perform properly the legal services rendered, and the amount of attorney's fees awarded in similar cases[11]**

Like the other factors, the reasonableness of the time and labor expended weighs in favor of approving Guidry's fees. Guidry's fees include the $19,000 flat fee plus the $284,357.43 contingency fee, which is 45% of the judgment plus interest to date. It is instructive to compare these fees to those of other attorneys involved in the state court proceedings. Christopher Campbell ("Campbell"), the attorney for Reid's insurance company during the state court proceedings, was paid $185,000 for a total of 1,207 hours billing at insurance defense rates of between $150 and $165 per hour. Campbell testified that Nancy Litwak[12] charged $215 per hour for the defense of the architect in the state court proceedings and has a standard rate of $300 per hour for private litigation. Campbell also testified that the hourly rate for general commercial litigation attorneys with approximately 12 years of experience, similar to Guidry, ranges from $400 to $450. Guidry testified that his standard rate is $350 per hour, which is below the range of standard rates based on Campbell's testimony

---

[11] These are factors 2, 4, and 12 of § 6-21.6. They are analogous to <u>Abrams</u> factors 1 ("time and labor required in the case"), 3 ("skill required to perform the necessary legal services"), and 12 ("fee awards made in similar cases"). This section also addresses <u>Abrams</u> factors 4 ("preclusion of other employment due to acceptance of the case"), 7 ("the time pressures imposed in the case"), and 9 ("experience, reputation, and ability of the lawyer").

[12] Nancy Litwak was formerly with Hamilton Moon Stephens Steele & Martin and is now with Rosenwood, Rose & Litwak. She and Campbell have litigated against each other on a few different occasions since 2012.

and only slightly more than Litwak's rate. Based on the approximately 1,355 hours that Guidry worked during the state court litigation, his contingency fee in this case equates to around $205 per hour. This is well below his normal hourly rate and the hourly rates that Campbell testified are normal for an attorney of his experience. Had Guidry billed Y2 Yoga his standard rate, Y2 Yoga would have incurred legal fees closer to $475,000. Based on this and the other evidence Guidry provided in his declaration and at the hearing, Guidry's time, labor expended, and billing rates are reasonable.

Furthermore, Guidry has the skill and experience required to perform the legal services rendered, and the fees awarded in similar cases and the time commitment of the case support awarding Guidry's fees. Guidry has practiced law in North Carolina since 2008 and focuses his practice on commercial and business litigation. He worked with King & Spalding until early 2017 and then joined a smaller firm before starting his own firm in 2018. Guidry has handled clients through arbitration, trial, and on appeal on a wide variety of issues including contracts, real estate, and construction. In addition, the state court litigation involved a substantial time commitment that precluded Guidry from working on other matters for other clients and imposed time pressures. Y2 Yoga originally contacted Guidry in late 2016 and then retained him in April 2017. The proceedings lasted over a

year and a half, with a jury verdict in December 2018.  Finally,
the actual award in the case is tied to the result of the case
given that the fee is a contingency fee.  A 45% contingency fee is
a fairly standard rate for a complex case with a high risk of not
being able to collect the award.  Thus, it stands to reason that
the award is fair compared to other cases since the contingency
fee is fair.  As a result, the experience required, time pressures,
and fees awarded in similar cases weigh in favor of Guidry in
considering whether his fees are reasonable.

Henderson's fees are also reasonable when analyzing the time
and labor expended, rates charged, skill required to perform the
legal services rendered, and the time commitment that the case
required.  Henderson's initial fee agreement with Y2 Yoga in
September 2018 billed an hourly rate of $350, which is less than
his standard rate of $450 per hour.  Henderson amended his fee
agreement in February 2019 when it became apparent that the case
was not going to be short lived to charge his normal rate of $450
per hour.  Four hundred and fifty dollars per hour is comparable
to other bankruptcy attorneys in the Charlotte area with
Henderson's experience.  Henderson has spent approximately 567
hours on the bankruptcy cases, and the fees he has accrued in these
cases have been driven in large part by the arguably unnecessary
filing of the bankruptcy cases and litigious manner in which they
have been pursued by the Debtors.  The Debtors' litigiousness

includes the appeal of the motion to convert which was recently dismissed by the Fourth Circuit and, most recently, a motion to reconsider the court's December 2, 2020 order that was an overt attempt to reargue matters already litigated. Moreover, Henderson has the skill required for these bankruptcy cases, as he has been a bankruptcy attorney since 1994 and the court is familiar with his work in many of his cases. The time pressures and work spent on this case are considerable for all the same reasons they were for Guidry and for the same reasons that make the bankruptcy cases complex. The Debtors filed the bankruptcy cases in September and October of 2018, and they remain pending to this day. Thus, in considering the reasonableness of Henderson's fees, all the factors involving skill, experience, and time pressures weigh in favor of approval of Henderson's fees.

Finally, with respect to HT, their fees are also reasonable when considering the time, labor, skill required, and time pressures of the case. Matz and Guidry both testified that the work performed by HT was very helpful in "getting the ball rolling" and the second complaint HT filed ultimately served as the basis for Y2 Yoga's success at trial. HT did considerable work in assessing the construction problems and advising Y2 Yoga, and Guidry stated that the work provided a great benefit to him. Matz testified that he was pleased with HT's work and the only reason that Y2 Yoga stopped using the firm was due to the fact that Y2

Yoga could no longer afford the expense of hourly billing. Matz further testified that he reviewed the time sheets on a biweekly basis and had no objection to any of the time sheets or the work HT performed. Gregory Shelton was the primary attorney for HT, and he charged an hourly rate of $300 per hour, which is standard for commercial litigation attorneys in the Charlotte, North Carolina area. In summary, HT's fees are reasonable when assessing the time, labor, skill required to perform the legal work, and the time commitments of the case.

**D. Efforts at voluntary resolution and the relative economic positions of the parties.**[13]

Although Y2 Yoga is a creditor in this case and VR King and Reid are the parties filing bankruptcy, Y2 Yoga is not in a strong relative economic position compared to the Debtors. First, it remains to be seen if it was even necessary for the Debtors to file bankruptcy given that the debtors appear to be fully solvent. As for Y2 Yoga, it incurred substantial debt to undertake the construction project and has spent a great deal of money on litigation. It was unable to continue to pay HT and forced to retain Guidry on a contingency fee arrangement. As of the date of

---

[13] This section address the following factors under § 6-21.6: 5 ("[t]he relative economic circumstances of the parties"), 6 ("[s]ettlement offers made prior to the institution of the action"), 7 ("[o]ffers of judgment pursuant to Rule 68 and whether judgment finally obtained was more favorable than such offers"), 8 ("[w]hether a party unjustly exercised superior economic bargaining power in the conduct of the action"), 9 ("[t]he timing of settlement offers"), and 10 ("[t]he amounts of settlement offers as compared to the verdict"). None of the <u>Johnson</u> factors address settlement attempts.

the hearing, Y2 Yoga's balance sheet showed that it was insolvent.
By comparison, the Debtors' insurance company, Nautilus, covered
all the Debtors' state court litigation costs.   An October 24,
2018, email from Campbell to Guidry confirms that Campbell's
defense of the defendants carried through the end of trial.   In
light of all this, it cannot be concluded that either party
unjustly exercised superior economic bargaining power in this case
or had a strong economic position relative to the other.

At the hearing, the parties spent a great deal of time
discussing efforts at voluntary resolution, and the evidence was
somewhat contradictory and confusing, but ultimately this factor
is either neutral or weighs in favor of Y2 Yoga when assessing the
reasonableness of the attorney's fees.   Matz testified that he
attempted to settle the matter with Reid on behalf of Y2 Yoga
before litigation and spoke with Reid about 20 times over a three-
to-four-month period.   The Trustee questioned Matz's ability to
negotiate on behalf of Y2 Yoga, but as the "boots on the ground"
investor in Charlotte, Matz had clear authority to negotiate with
Reid and make settlement offers.   Matz told Reid that at least
$200,000 was necessary to settle the matter, but nothing came of
this offer.   Through HT, Y2 Yoga then issued a written demand
letter to Reid and gave him up to 45 days to respond.   Reid never
responded and conversations stopped after proceedings commenced.

None of the parties introduced evidence regarding an offer of judgment pursuant to North Carolina Rule of Civil Procedure 68.

Before litigation began, the parties attended an all-day mediation. According to Campbell, Y2 Yoga's demand at mediation was $1.5 million with $350,000 in cash and a consent judgment placing the Reid defendants' properties in receivership. In contrast, Guidry testified that the demand was $1.5 million in cash. There was a lot of discussion surrounding the demand, but the talks were not fruitful due to Y2 Yoga's concern as to what extent the defendants' real estate properties were subject to liens or other encumbrances. Thus, no formal settlement offer was made at mediation. Campbell's October 24, 2018, email states that Y2 Yoga's demand during trial was approximately $1.25 million, including at least $400,000 in cash. The Debtors' offer consisted of a $600,000 unsecured claim in bankruptcy plus $50,000 in cash and required Y2 Yoga to consent to waive the pre-judgment attachment. Y2 Yoga did not make any attempts to settle the case during the trial or after the commencement of the bankruptcy cases.

The attorney for Reid claimed that during the bankruptcy proceedings, Reid offered to settle these matters for the amount of the Final Judgment plus $20,000 in cash. The attorney for Reid indicated that Reid never received a response to this offer, but due to the conversion of the case to a Chapter 7 bankruptcy, it appears that Reid's counsel did not have the authority to make

that offer.  Throughout all of the proceedings, the settlement
negotiations were extremely limited, and according to Guidry, the
dynamic between Reid and the insurer created an obstacle to
engaging in meaningful settlement discussions, as the insurer had
no apparent interest in contributing to any settlement.

In the end, the parties were unable to reach a settlement
surrounding these terms and the case went to the jury for verdict.
Campbell described in an email dated October 30, 2018, to
Henderson, Guidry, and the Debtors' bankruptcy counsel at the time
that the parties had not yet figured out how to make concessions
on issues that were "non-starters" for either side.  For example,
Reid would not voluntarily dismiss his bankruptcy case and Y2 Yoga
would not waive pre-judgment attachment for the purpose of
priority. In conclusion, the settlement offers made by the parties
throughout the proceeding never resulted in anything material and
discussions were never fruitful as the parties could not get past
key issues.  Thus, as this pertains to the reasonableness of the
attorney's fees of Henderson, Guidry, and HT, the factors regarding
settlement are a neutral factor and, if anything, weigh slightly
in favor of Y2 Yoga given its efforts to settle before the state
court litigation commenced.

In comparing the settlement offers made by Reid during trial
and the Final Judgment, the Final Judgment is more favorable.
Reid's last offer of a $600,000 unsecured claim in bankruptcy plus

$50,000 in cash was, based on the original schedules and statements filed in Reid's Chapter 13 bankruptcy, an almost worthless offer. The real estate offered as settlement in early settlement discussions was also unattractive given the concerns regarding liens and other encumbrances on the properties. Therefore, the judgment in this case, a secured claim in the amount of $396,649.57 plus costs, interest, and the right to attorney's fees pursuant to the reciprocal attorney's fees provision in the Construction Agreement, is more favorable than any settlement offer made by the Debtors. As a result, the verdict compared to the settlement offers weigh in favor of considering Y2 Yoga's attorney's fees reasonable.

### E. The terms of the business contract[14]

The final factor in analyzing the reasonableness of attorney's fees is the terms of the Construction Agreement, and this factor weighs in favor of awarding attorney's fees. The court previously considered the Construction Agreement in its December 2, 2020 order and determined that the indemnity provision is valid and enforceable as a reciprocal attorney's fees provision under § 6-21.6. Therefore, the terms of the contract support approving the attorney's fees of HT, Guidry, and Henderson.

---

[14] This is factor 13 of § 6-21.6.

## V.    Conclusion

In conclusion, all the factors under North Carolina General Statute § 6-21.6 are either neutral or weigh in favor of awarding Y2 Yoga all of its attorney's fees.  The factors under 11 U.S.C. § 506(b) in assessing the reasonableness of attorney's fees are largely similar to those found in § 6-21.6.  As a result, Y2 Yoga has met its burden in demonstrating that the attorney's fees in the Claim are reasonable, regardless of whether the Claim is secured or unsecured.  None of the objections raised by the Trustee or the Debtors have sufficient merit to conclude otherwise. Accordingly, the court hereby **OVERRULES THE TRUSTEE'S AND DEBTORS' OBJECTIONS TO CLAIM.**

**SO ORDERED.**

This Order has been signed                    United States Bankruptcy Court
electronically. The Judge's
signature and Court's seal
appear at the top of the Order.